# 24-1002-cv

## 𝕯nited 𝕾tates 𝕮ourt of 𝕬ppeals

### *for the*

## 𝕾econd 𝕮ircuit

---

NEW CONCEPT ENERGY, INC.,

*Plaintiff-Appellee,*

– v. –

GUY GENTILE,

*Defendant-Appellant,*

MINTBROKER INTERNATIONAL, LTD.,

*Defendant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLEE

MIRIAM TAUBER
MIRIAM TAUBER LAW PLLC
885 Park Avenue, Suite 2A
New York, New York 10075
(323) 790-4881

DAVID LOPEZ
LAW OFFICE OF DAVID LOPEZ
171 Edge of Woods Road
P.O. Box 323
Southampton, New York 11968
(631) 287-5520

*Attorneys for Plaintiff-Appellee*

 (800) 4-APPEAL • (376857)

## FRAP 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to FRAP 26.1(a) and in compliance with FRAP 28(b), the undersigned counsel for <u>Plaintiff-Appellee New Concept Energy, Inc.</u> (a non-governmental corporation) certifies that the following are corporate parents, affiliates and/or subsidiaries of said party, which are publicly held.

Corporate parents: **None**

Corporate affiliates (owners of more than 10% of the Plaintiff's stock):     **None**

Corporate subsidiaries:   **None**

/s/ Miriam Tauber
Attorney for Plaintiff/Appellee

## TABLE OF CONTENTS

|  | **Page** |
|---|---|
| **Table of Authorities** | iii |
| **THE APPEALS SHOULD BE DISMISSED FOR FUGITIVE DISENTITLEMENT** | 1 |
| **PLAINTIFFS' RESPONSE *IF THIS APPEAL IS HEARD*** | 7 |
| **OVERVIEW** | 7 |
| **COUNTER-STATEMENT OF THE CASE** | 10 |
| **Facts** | 10 |
| A. Gentile and Mintbroker | 10 |
|   I. The Trades at Issue | 12 |
|   II. Mintbroker's "Customer Trades" | 13 |
| B. Procedural History | 16 |
|   I. These Actions | 16 |
|   II. Gentile's Access to Mintbroker's Records | 18 |
| **SUMMARY OF ARGUMENT** | 20 |
| **STANDARDS OF REVIEW** | 22 |
| **ARGUMENT** | 23 |
| **POINT I. PROFITS RECOVERABLE IN THESE SUITS WERE CORRECTLY DETERMINED BY THE DISTRICT COURT** | 23 |
| A. "Pecuniary Interest" Was Addressed and Established on Summary Judgment | 23 |
| B. Damages Were Properly Determined at the Inquest | 29 |
|   1. The Inquest Was Ordered to Calculate the Amount of §16(b) Profits Realized by Defendants From Trading in the Interactive Brokers Account—Not to Relitigate Defendants' §16(b) Liability or Pecuniary Interest in the Account | 29 |
|   2. Plaintiffs Established a Prima Facie Case for Disgorgement of Short Swing Profits Based on Trading in the Interactive Brokers Account | 31 |
|   3. Gentile Did Not Demonstrate That Any Shares or Profits Were Traded or Realized in the Interactive Account for the Benefit of Third-Party Customers of Mintbroker, and Excluded From Their Pecuniary Interest | 32 |
|     a. Gentile's Damages Theory Was Rightly Rejected as Incompatible With the Law of the Case and With Governing Law | 32 |
|     b. The Expert Reports and Testimony Were also Properly Excluded as Unreliable | 33 |

| | |
|---|---|
| **POINT II.  THE PRE-JUDGMENT INTEREST AWARDS WERE PROPER** | 35 |
| **POINT III.  PLAINTIFFS HAVE CONSTITUTIONAL STANDING** | 37 |
| **CONCLUSION** | 39 |

## Table of Authorities

### Cases

*Bar-Levy v. U.S. DOJ,*
  990 F.2d 33 (2d Cir. 1993) ................................................................. 2

*Blau v. Lehman,*
  368 U.S. 403 (1962). ....................................................................... 35

*Brown v. C. Volante Corp.,*
  194 F.3d 351 (2d Cir. 1999)) .......................................................... 22

*Carter v. HealthPort Technologies, LLC,*
  822 F.3d 47 (2d Cir. 2016) ............................................................. 23

*Degen v. U.S.,*
  517 U.S. 820 (1996) .......................................................................... 4

*Donoghue v. Bulldog Investors GP,*
  696 F.3d 170 (2d Cir. 2012). .......................................................... 37

*Empire Blue Cross & Blue Shield v. Finkelstein,*
  111 F.3d 278 (2d Cir. 1997) ..................................................... 2, 3, 4, 7

*Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.,*
  67 F.3d 1063 (2d Cir. 1995) ........................................................... 23

*Henry v. Oluwole,*
  108 F.4th 45 (2d Cir. 2024) ............................................................ 22

*Microbot Medical, Inc. v. Mona,*
  24-cv-559, 2025 WL 262590 (2d Cir. Jan. 22, 2025) ........................ 38

*Morales v. Freund,*
  163 F.3d 763 (2d Cir. 1999), ......................................................... 35

*Ortega-Rodriguez v. U.S.,*
  507 U.S. 234 (1993) .......................................................................... 2

*Packer v. Raging Capital Management, LLC,*
  105 F.4th 46 (2d Cir. 2024) ........................................................... 38

*Palin v. New York Times Co.,*
  113 F.4th 245 (2d Cir. 2024); ........................................................ 22

**Cases** (continued)

*Trustee for SIPA Liquidation of*
  *Bernard L. Madoff Investment Securities LLC v. JABA Assocs. LP,*
  49 F.4th 170 (2d Cir. 2022) ................................................................. 25

*Roth v. Jennings,*
  No. 03-CV-7760-DAB, 2009 WL 1440670 (S.D.N.Y. May 21, 2009). .............. 36

*Saulpaugh v. Monroe Cty. Hosp.,*
  4 F.3d 134 (2d Cir. 1993) ................................................................. 37

*SEC v. First Jersey Securities, Inc.,*
  101 F.3d 1450 (2d Cir. 1996) ............................................................ 23

*Smolowe v. Delendo Corp.,*
  136 F.2d 231 (2d Cir. 1943) ............................................................. 21

*TranUnion LLC v. Ramirez,*
  594 U.S. 413 (2021), ...................................................................... 38

*U.S. v. $45,940 in U.S. Currency,*
  739 F.2d 292 (2d Cir. 1984)) ............................................................... 2

**Rules**

Federal Rule of Evidence 702 .......................................................... 9, 31

iv

## THESE APPEALS SHOULD BE
## <u>DISMISSED FOR FUGITIVE DISENTITLEMENT</u>

Application of the fugitive disentitlement doctrine is within the Court's discretion. Plaintiffs invoke it and respectfully ask the Court to dismiss these appeals in light of Gentile's liquidation of his United States assets, his removal of their proceeds from the Court's reach, his flouting of District Court orders resulting in an order holding him in contempt and issuing a bench warrant for his civil arrest. Gentile currently remains in hiding. His counsel on these appeals has stated in open court that he is unable to contact his client to ensure his compliance with any orders of the District Court or that may be issued by this Court.

Plaintiffs previously moved for dismissal, or alternatively, stays of these appeals on the grounds that Gentile has absconded since he filed this appeal without posting a bond for any portion of the judgments totaling more than sixteen million dollars. Having refused to disclose his whereabouts to Plaintiffs or to the District Court in response to Plaintiffs' efforts to take discovery for purposes of enforcing the judgments, Gentile was held in contempt by Judge Cote, who issued an order for his civil arrest by the U.S. Marshal. (SA-15.) Gentile is now a fugitive. This Court denied Plaintiffs' motion without prejudice to renewal of the request in this Brief "based on legal authority and the record." (Motion Order, *Avalon,* No. 24-999, Dkt. 43; *New Concept* 24-1002, Dkt. 47.1)

1

Plaintiffs now renew their application for dismissal (or alternatively, a stay) of these Appeals based on the longstanding "Fugitive Disentitlement Doctrine" as applied by this Court. *See Empire Blue Cross & Blue Shield v. Finkelstein,* 111 F.3d 278, 282 (2d Cir. 1997) ("We hold that we have discretion to dismiss the appeal of a civil litigant who becomes a fugitive to escape the effect of the civil judgment").

It is the teaching of this Court that the Fugitive Disentitlement Doctrine allows for dismissal of the appeal of a defendant who becomes a "fugitive from justice during the pendency of the appeal." *See id.* at 280 (quoting *Ortega-Rodriguez v. U.S.*, 507 U.S. 234, 239 (1993)).

> "We have advanced four rationales for disentitling fugitives:
> 1) assuring the enforceability of any decision
>    that may be rendered against the fugitive;
> 2) imposing a penalty for flouting the judicial process;
> 3) discouraging flights from justice
>    and promoting the efficient operation of the courts; and
> 4) avoiding prejudice to the other side
>    caused by the defendant's escape." *Empire*, 111 F.3d at 280.

Although "the doctrine of disentitlement is most typically enforced against criminal defendants," this Court has also applied the doctrine to "appeals from a variety of civil cases and proceedings." *Empire,* 111 F.3d at 280-81 (e.g., deportation and civil forfeiture orders, citing, *inter alia, Bar-Levy v. U.S. DOJ*, 990 F.2d 33 (2d Cir. 1993); *U.S. v. $45,940 in U.S. Currency*, 739 F.2d 292 (2d Cir. 1984)). Indeed, this Court and others recognize that the fugitive disentitlement rule should apply with even greater force where the order that the defendant appealed,

2

and has evaded by absconding, is a monetary judgment that does not threaten the "individual's liberty." *Empire*, 111 F.3d at 280 (quoting *Conforte v. CIR,* 692 F.2d 587, 589 (9th Cir. 1982)).

In *Empire*, the Court held that defendants who—like Gentile in this case—failed to respond to the plaintiff's efforts to take discovery for purposes of enforcing the substantial monetary judgment entered against them and ignored the resultant court order holding them in contempt and issuing a bench warrant—were considered "fugitives" disentitled from pursuing their appeal of the judgment. *See Empire,* 111 F.3d at 281-82:

> "Finkelstein and Greenbaum failed to show up for their properly-noticed depositions and failed to comply with a court order to appear before the district court. Efforts failed to contact or locate the defendants at the addresses and phone numbers supplied by their own counsel. Finally, after four futile visits by a process server, the district court issued bench warrants for the arrest of Finkelstein and Greenbaum. … Finkelstein and Greenbaum are not in custody and have not surrendered to the authorities; their whereabouts are unrevealed. ***They are facing an immense judgment. Finkelstein and Greenbaum have continued to evade arrest, and are therefore fugitives from justice.***" (Emphasis added).

Gentile's conduct is nearly identical to the conduct of the defendants in *Empire. Gentile's attorney of record in these appeals appeared at the contempt hearing before Judge Cote and informed the District Court that he had no working phone number, email address, or contact information for his client on these appeals,* and no way of reaching Gentile to assure the District Court or this Court

3

of his compliance with orders issued by either. (SA-11.) This Court should decline to hear his appeals for the same reasons that it refused to hear the defendants in *Empire*.

Plaintiffs have been unable to serve Gentile with enforcement discovery, except to serve his attorney of record both in the district court cases and in these appeals. Gentile's counsel professes to have no current contact information for Gentile, and the District Court has held Gentile in contempt and issued an order for his civil arrest. (*See* Order, SA-15.) Gentile has not since been located or surrendered to the authorities; his "whereabouts are unrevealed" at this time. *See Empire*, 111 F.3d at 280-81 (distinguishing *Degen v. U.S.*, 517 U.S. 820 (1996), as involving a defendant that "was back in custody").

As the Court held in *Empire*, Plaintiffs are "prejudiced—perhaps irrevocably—by the defendant's absence." Gentile has "knowingly and willfully made himself unavailable for service of process and post-trial depositions, and this absence has rendered the Plaintiffs' judgments unenforceable." *Empire*, 111 F.3d at 282. Add to that his surreptitious liquidation and extraction of assets previously located in the United States.

Plaintiffs have already been prejudiced by Gentile's "delay of this litigation through his machinations" detailed in Magistrate Judge Lehrburger's Report & Recommendation ("R&R") (SPA-100). Gentile's vexatious conduct

4

delayed the entry of Judgment for over two years following entry of Judge Broderick's order on the parties' cross-motions for summary judgment finding Gentile liable for realization of short swing trading profits in violation of §16(b), and was held by Magistrate Judge Lehrburger and Judge Cote to warrant awards of pre-judgment interest (included in each of the Judgments), *and sanctions* (which Plaintiffs subsequently waived in the interest of promoting the expedient entry of final judgments without further delay) (*see Avalon* Dkt. 278; *New Concept* Dkt. 262). And Plaintiffs were, of course prejudiced by Gentile's short swing trading of their stocks in the first instance, which as Judge Cote also noted, was not an "inadvertent" violation of the strict liability statute (Opinion p.15, SPA-117). Gentile engaged in a deliberate pump and dump scheme encapsulating the type of manipulative trading captured by §16(b).

As in *Empire*, "Disentitlement therefore represents the sole remaining means of minimizing the prejudice caused by defendants' fugitive status" on this appeal.

The concerns underlying the Fugitive Disentitlement Doctrine were acutely presented in this case by an exchange between the District Court and Gentile's counsel at the hearing held to address the issue of Gentile's disappearance following the filing of this appeal and failure to respond to Plaintiff's enforcement discovery. (*See* Hearing Tr., SA-12-SA-13):

THE COURT:     You know, as I think about this, Mr. Fleming—excuse me one second—I don't know that the Court of Appeals would be very happy to know that any ruling they issue on an appeal you could not effectively communicate with your client and that he is not returning your messages, not paying you; that you don't have an email address, a phone number or mailing address for him that is effective.

Now, the Court of Appeals has its own rules with respect to the requirements of counsel who appear before it on behalf of clients. I'm not going to presume to tell you what those rules require, but I know, for me, if I have an attorney in court taking positions on behalf of a client they could no longer communicate with, such that if I ordered them to do something they could not effectively bring their client in to court to respond to that order, I would expect counsel to tell me.

MR. FLEMING:  I understand that, your Honor, but I—the appellate process is different from the district court process, and I certainly wouldn't be here with such a client at the district court level. But there's really very few outcomes at the appellate court. I mean if it's affirmed, it's affirmed; it's a victory for the Plaintiffs, and we proceed. If it's reversed, then presumably, maybe Mr. Gentile will come out from where he is. I have no idea what will happen at that point.

THE COURT:     Mr. Fleming, again, I'm not ruling as to Second Circuit would expect of counsel who appear before it. I leave that for you and them to determine."

Gentile's counsel's inability to bring his client into compliance with Court orders, and his brazen implication that his client might "come out from where he is"—from where he is hiding—only if there is a favorable outcome on this appeal, are succinct statements of the core rationales for the Fugitive Disentitlement Doctrine." As this Court held, "We see no reason to entertain the cause of one who

6

will respond to a judgment only if it is favorable." *Empire*, 111 F.3d at 282 (internal citations omitted).

Judge Cote quite correctly stated that the "Court of Appeals has its own rules" to address this scenario. One of those rules is fugitive disentitlement. Plaintiffs respectfully request that the Court exercise its discretion to dismiss these appeals while Gentile remains a fugitive.

## PLAINTIFFS' RESPONSE *IF THIS APPEAL IS HEARD*
## OVERVIEW

Following Judge Broderick's entry of summary judgment for Plaintiffs, which found that Plaintiffs had met their burden of establishing that Defendants had "beneficial ownership" of and a "pecuniary interest" in shares traded by Gentile in the Interactive Brokers account, the cases were referred to Magistrate Judge Lehrburger for an inquest on damages—i.e., "to determine the exact period of time that Defendants were more-than-10% beneficial owners, and to perform the matching analysis for relevant periods." (SPA-110-111.)

The need for an inquest was driven by the sheer volume of trades reflected in the Interactive Brokers statements on which liability was based, which created complexity in calculating the number of shares held in the account at any time and identifying the purchases and sales by which the total holdings in the Interactive Brokers account crossed over and under 10% of Plaintiffs' outstanding

7

shares, and in performing the "matching analysis" for trades executed in the account during those periods.

The purpose of the inquest ordered by Judge Broderick was not to determine whether any shares should be excluded as attributed to clients of Mintbroker.

As reviewed in Judge Cote's Opinion and in the R&R, the evidence submitted to Judge Broderick on summary judgment included testimony, numerous discovery responses, and a stipulation expressly entered into for the purpose of summary judgment, which stated that all trading in the Interactive Brokers omnibus account was "proprietary," and did not include any trades executed on behalf or for the benefit of clients. That stipulation was entered into by Gentile for the purpose of avoiding production of the "thumb drive" containing Mintbroker's records, which was in the possession of *Gentile's own counsel* as well as Mintbroker's counsel and was never unavailable to Gentile at any time. (*See* R&R p.41, SPA-83: "The parties' dispute about damages had nothing to do with whether the Interactive Trading Records were incomplete or with any distinction between Mintbroker's trades for its proprietary account and those for client accounts").

Once summary judgment was entered, Gentile changed course and sought to introduce files from the thumb drive supposedly reflecting trading in customer accounts (the "Post-Discovery Records"). (*See* Opinion pp.9-10, SPA-111-

112, noting that the Post-Discovery Records "purportedly came from the same thumb drive that Plaintiffs sought to compel Defendants to produce, and which was in possession of both "Gentile's and Mintbroker's attorneys in the Bahamas").

Nonetheless, Judge Lehrburger did not refuse to consider the Post-Discovery Records or the expert reports and testimony that Gentile was permitted to introduce to explain their supposed relevance. To the contrary, the focus of the inquest, which was ordered by Judge Broderick to determine damages and should have been an arithmetic "matching" exercise, was devoted to reviewing the Post-Discovery Records and testimony of Gentile's experts that he claims the District Court ignored.

Judge Lehrburger and Judge Cote both properly rejected Gentile's characterization of the Post-Discovery Records as "new evidence" that could be permitted to overturn the law of the case as correctly decided by Judge Broderick on summary judgment. Judge Lehrburger and Judge Cote also determined that the methodology employed by Gentile's experts to identify and link customer orders purportedly reflected in the Post-Discovery Records to trading in the Interactive Brokers account was unreliable and did not meet the criteria for admissibility under F.R.E 702.

Judge Cote properly adopted Judge Lehrburger's recommendations for entry of judgment and an award of pre-judgment interest in both cases, and the

9

interest rate applied by the District Court was within the Court's discretion and supported by case law and the equitable considerations articulated in the R&R and the District Court's Opinion. The Judgments should be affirmed.

## COUNTER-STATEMENT OF THE CASE

### A. Facts

#### I. Gentile and Mintbroker

Gentile is the founder of Mintbroker, also known as Swiss America Securities and "SureTrader" (among other names), which was a brokerage firm catering to day traders registered and domiciled in the Bahamas. It has now been involuntarily liquidated at the bequest of the Securities Commission of the Bahamas ("SCB"). At the time of the trading giving rise to these cases and when these cases were filed, Gentile was the 99% owner of Mintbroker, with the remaining 1% owned by one of Gentile's lawyers. Gentile and his lawyer were the only two directors of Mintbroker, the minimum number of directors that Gentile explained he believed Bahamian law required. (*See* Gentile Dep. Tr. p.7, A-1505.)

While these actions were pending, the SCB was also investigating Mintbroker. Following a meeting with Gentile, "the SCB issued a letter to Gentile accusing Mintbroker of failing to trade any securities on behalf of clients and instead recording client orders internally in a manner akin to a Ponzi scheme with no transaction having been entered on the market." (Opinion p.5, SA-107.) Five days

10

later, "Gentile left the Bahamas and gave directives to close down Mintbroker such that by the end of October or early November 2019, the office was closed and only a few employees remained." (Id.) In December 2019, Mintbroker's former IT manager Stephen Darville delivered a copy of a "thumb drive" containing Mintbroker's records to Mintbroker's counsel and to Gentile's personal counsel in the Bahamas, retaining a copy for himself. (Id. p.13, SPA-115.)

Plaintiffs' discovery requests were first issued to Defendants in October 2019, following Judge Broderick's denial of Defendants' motion to dismiss. In view of Mintbroker's abrupt closure, Plaintiffs raised their concerns about "the lack of more detailed trading records and other supporting documentation produced by Gentile" with Judge Lehrburger. (Id. p.6, SPA-108.) Gentile's counsel assured Judge Lehrburger that Mintbroker had produced all relevant trading documents and that "Gentile had done a diligent search and that there were no other records." (Id.)

In March 2020, the SCB placed Mintbroker into provisional liquidation. (Id. p.7, SPA-109.) Gentile falsely claims he then "lost access" to Mintbroker's records. As Judge Cote notes, however, Gentile's "own attorney" also remained in possession of a copy of the "thumb drive" containing Mintbroker's records. (Id. p.13, SPA-115.) When Plaintiffs sought to compel production of this thumb drive, Gentile did not claim that it was "unavailable" to him or that its production was in any way restricted by Bahamian law. Gentile made that claim, in

11

the form of "mere speculation for which Gentile has not provided any authority," only after he lost his motion for summary judgment and Plaintiffs won theirs. (R&R pp.38-40 & n.27, SPA-80-82.)

Instead, Gentile resisted and ultimately avoided production of the thumb drive by entering into the Stipulation for Purposes of Summary Judgment suggested by Judge Lehrburger, which stated that the Interactive Brokers account was a "proprietary" account that did not include any trading by Mintbroker's customers. (Opinion, p.7, SPA-109.)

## II. <u>The Trades at Issue</u>

Based on Gentile's initial disclosure that most of the trading reported on Mintbroker's Schedule 13D reports were executed through Interactive Brokers, Plaintiffs obtained copies of Mintbroker's account statements by third-party subpoena to Interactive Brokers. The trading found by the District Court to give rise to Gentile's §16(b) liability in this case, as summarized in Judge Broderick's order and cited in Gentile's Brief (p.9), are the trades that were proven to have been executed in the public market through Mintbroker's Interactive Brokers omnibus account.

Plaintiffs have never relied on the trades reported in Defendants' Schedule 13D statements. (*See* R&R p.21, SPA-63: "The trading records underlying the motions and on which the Court rendered its summary judgment decision were

12

the Interactive Trading Records that were the subject of the Joint Stipulation. Plaintiffs, in particular, relied on the Interactive Trading Records to determine the dates and times at which Defendants crossed the 10% beneficial ownership threshold for both Avalon and New Concept stock." *See also* Opinion p.12, SPA-114: "The 'trading records' referred to [in Judge Broderick's summary judgment ordrer] are the Interactive records.")

Gentile has never denied that he alone placed all of the trading in the Interactive Brokers account. As reviewed in the R&R, Gentile responded to Plaintiffs' diligent efforts to inquire as to whether any of the trading in the Interactive Brokers account included trading executed for the benefit of Mintbroker's customers by repeatedly asserting and ultimately stipulating that the Interactive Brokers account was a "proprietary account," that "Gentile was in charge of that account and placed the trades," and that there was "no need for discussion of client accounts." (R&R p.40, SPA-82.)

## III.   Mintbroker's "Customer Trades"

After summary judgment was granted for Plaintiffs based on trading in the Interactive Brokers account, Gentile sought to introduce Post-Discovery Records from the "thumb drive," which he falsely claimed were previously unavailable, and supposedly reflected trading by Mintbroker's customers.

Gentile's description of trades supposedly placed by customers in "self-directed" accounts based on the Post Discovery Records is irrelevant. Gentile's liability in this case is based on trades that he personally executed through the Interactive Brokers account, which he controlled. (*See* R&R p.17, SA-59, quoting Gentile's counsel as representing to the District Court that "this was a proprietary trading account … Gentile was in charge of that account and placed the trades.") In contrast, Gentile insists even in his Brief on appeal that Mintbroker did not place trades or "manage accounts" for customers.

Judge Lehrbrger correctly found that the Post-Discovery Records do not establish that any shares or funds traded in the Interactive Brokers account were segregated for or credited to any customers of Mintbroker:[1]

> "As Plaintiffs aptly note, however, not a single example of an account statement, trade order, or execution confirmation, and not a single receipt evidencing the withdrawal of cash or stock by any Mintbroker clients have been produced that can be confirmed or reconciled against the Post Discovery Records." (R&R p.32, SPA-74.)

As Judge Lehrburger concluded:

---

[1]  Fn.2 of Gentile's Brief refers to apparent "wash trading" reflected in the records introduced at the inquest, which Gentile suggests reflected trading by "two separate beneficial owners." The term "beneficial owner" is used in this context without clarity or definition. Under both definitions of "beneficial ownership" applicable under §16(b), more than one shareholder may be the beneficial owner of the same shares (e.g., a husband and wife, or a corporation and its sole individual owner, may both be beneficial owners of shares held in one name or another); and in that case, a transaction between them might not change the "beneficial ownership" of either.

14

> "The fact remains that the Post-Discovery Trading Records are no more than Mintbroker's internal log of how it purportedly fulfilled orders. Neither expert did anything to confirm whether client-related transactions in the Post-Discovery Trading Records were 'actually effected for the clients.' (Hrg. 270, 296.) Nor did they attempt to verify whether any stock designated as bought or sold for a client was in fact actually credited to any client accounts, or in fact whether any segregated client accounts existed at all. (Hrg. 250-51, 296-97.) The only accounts that have been established with sufficient basis in fact are those evidenced in the Interactive Trading Records and that served as the basis for summary judgment: Mintbroker's proprietary account for which Mintbroker and Gentile conducted all trades."
> (R&R p.52, SPA-94.)

To be clear, there is no implication that Mintbroker did not have any customers. But there is also no evidence that any trades were actually placed on the market or that any shares or funds held by Mintbroker, in the Interactive Brokers account or otherwise, as custodian for the benefit of third-party customers of Mintbroker.[2] As Gentile admits, customer trades were typically routed internally, without a trade ever being placed on the market. This is consistent with SCB Executive Director Christina Rolle's finding, reviewed in the R&R and the Opinion, that Gentile was operating Mintbroker and managing customer accounts in a manner "akin to a Ponzi scheme," by "failing to trade any securities on behalf of clients and

---

[2]     The only example of a "customer" account statement referred to in Gentile's Brief, which Gentile first attempted to introduce after the inquest in his Objections to the R&R, is from an account indicated as owned by Nicholas Abadiotakis, Gentile's trustee. (*See* A-96; A-1924.)

instead 'recording' client orders internally … with no transaction having been entered on the market." (Opinion p.5, SPA-107; R&R p.13, SPA-55.)

Mintbroker doubtless had customers.[3] But as the District Court found, there is no evidence or indication that any of those customers controlled any of the shares or had access to any of the trading proceeds held in Mintbroker's Interactive Brokers omnibus account. This is a simple failure of proof of Gentile's key contention.

## B.  **Procedural History**

### I.  **These Actions**

The only "coordination" of these two cases is the result of their designation as "related" actions by the District Court, the commonality of Plaintiffs' attorneys, and the overlap of witnesses and proofs. These cases are related not because the Plaintiffs have a prior history of acting in concert or even of ever previously communicating with each other. They are related cases because each of the Plaintiffs was unwillingly and unknowingly chosen by Gentile to be his instrumentalities for stock market manipulations by which he generated substantial short swing trading profits prohibited by §16(b).

---

[3]     The SEC recently obtained a jury verdict in their case in the Southern District of Florida against Gentile and Mintbroker for improperly soliciting many of those customers. *See SEC v. Gentile*, No. 21-cv-21079 (S.D. Fl.) Notwithstanding that he is a fugitive, Gentile has stated that he plans to appeal.

16

Each Plaintiff is a microcap issuer with two to three million shares outstanding and a substantial fraction of those shares closely held so that the public float is greatly reduced below even those modest levels. Each has a listing on a national stock exchange, making for ease of short selling and margin trading by speculators. Each had its public market for shares "taken in hand" by Gentile, who quietly accumulated more-than-10% beneficial ownership of each of their stocks;[4] and who then unleashed a flurry of buying and selling that briefly raised their market prices sharply higher and induced market participants to join the frenzy.

Gentile caused increasing rapidity of accumulation and trading of shares to take place at increasing prices until the general public noticed and joined in the scrum. This was the "pump" phase of his scheme. When the pot had been well and truly stirred, with prices spiking by percentages in the hundreds, Gentile reversed course and began a rapid liquidation of his position. During the accumulation period members of the public were induced to buy on margin and the

---

[4]     As described in Avalon's Complaint, the Schedule 13D eventually filed by Defendants disclosed a position accumulated as suddenly as "Athena bursting forth from the head of Zeus." (Avalon Compl. ¶22, A-45; Am. Compl. ¶24, A-57.) Defendants' Schedule 13D reports disclosed that shares of both Plaintiffs' stocks were acquired to gain control of the companies and that the shares were purchased with Mintbroker's "working capital and margin borrowing" (Opinion p.4, SPA-106)—a representation contradicted by Gentile's assertion later in the case, including on this appeal, that a significant portion of the trades reported were executed by third party clients in self-directed accounts.

rapid reversal of Gentile's market participation punctured the bubble he had created. His exiting caused margin calls to go out.

Having cornered the market for New Concept shares, Gentile's repository of stock became the seller of last resort to those caught short in meeting their margin calls. Gentile was able to liquidate at whatever prices the market would bear. Gentile's highly profitable sales were executed within days of his acquiring a reservoir of shares exceeding 10% of the Plaintiffs' outstanding common stock— making him a statutory insider compelled by §16(b) to surrender his short-swing profits to the Plaintiffs. So successful and easy was his scam that Gentile promptly repeated the exercise with Avalon Holdings common stock. This description of Gentile's activities was spread upon the record before the District Court and was not challenged by Gentile.

Gentile prefers to refer to his "pump and dump" or "short squeeze" scam as "high frequency trading." Whatever the terminology, the implications of Gentile's conduct under §16(b) are clear and these lawsuits predictably followed.

## II.   Gentile's Access to Mintbroker's Records

Gentile's narrative of this case—that he was cut off from access to Mintbroker's records during discovery and suddenly able to access those records as soon as summary judgment was entered against him—was roundly and decidedly rejected by Magistrate Judge Lehrburger and Judge Cote as false. Gentile's own

18

counsel was in possession of the "thumb drive" containing Mintbroker's files throughout discovery. And so was Stephen Darville, Mintbroker's former IT manager, who Gentile only had to ask for a copy of the files when he needed it. (R&R p.24, SPA-66; Opinion, pp.9, 13, SPA-111, 115.)

Moreover, any claimed restriction imposed on Gentile's access to Mintbroker's files was the result of Gentile's own conduct in voluntarily shutting down Mintbroker while Plaintiffs' discovery requests were outstanding—contrary to his counsel's express representation to Judge Lehrburger in open court that his voluntary shutdown of Mintbroker did not make any documents unavailable for production in this case, and that his production was complete prior to Mintbroker's closing. (R&R pp.38-39, 59; SPA-80-81, 101.)

Gentile has also suggested that he was deprived of the opportunity to obtain additional documents from the liquidators that were sought by his outstanding letters rogatory. All documents in possession of the Bahamian liquidators were supplied by Gentile's counsel to the liquidators in the first place and were always within Gentile's possession and in his custody and control. Gentile raised no objection to holding the inquest without the documents sought by his outstanding letters rogatory, nor did he claim to need those documents in order to make his case for damages at the inquest.

After the District Court entered a stay of proceedings against Mintbroker in view of Mintbroker's liquidation, the District Court denied Gentile's separate motion for a stay of the case against him. (*See* R&R p.26, SPA-68.) The stay entered as to Mintbroker does not affect the Court's jurisdiction or to the continuity of this action.

## <u>SUMMARY OF ARGUMENT</u>

1.      In granting summary judgment for Plaintiffs, Judge Broderick considered both definitions of "beneficial ownership" applicable under §16(b) and found that Plaintiffs had met their burden of proof as to both, based on trades established as executed by Gentile in an Interactive Brokers account omnibus account held by Mintbroker, which Gentile controlled, and which was not segregated for the benefit of clients.

2.      Magistrate Judge Lehrburger and Judge Cote properly accepted Plaintiffs' computation of short swing profits based on the trades executed in the Interactive Brokers omnibus account, which Judge Broderick held Plaintiffs had established was within Gentile's "beneficial ownership" under both applicable definitions (i.e., investment control, and pecuniary interest). The trades executed by Gentile through the Interactive Brokers account were used to determine the period in which Gentile was a more than 10% "beneficial owner" and §16(b) insider. Purchases and sales executed in the Interactive Brokers account during the relevant

periods of insider status were matched according to the lowest-in, highest-out methodology prescribed by *Smolowe v. Delendo Corp.*, 136 F.2d 231 (2d Cir. 1943), by which Plaintiffs stablished a *prima facie* claim for damages.

3. After holding a two-day inquest, Magistrate Judge Lehrburger found no support for excluding any of the shares traded through the Interactive account from Gentile's "beneficial ownership" under either applicable definition— i.e., his investment control, for purposes of determining "insider status;" or his "pecuniary interest," for purposes of the matching analysis determining his liability for trading while an insider subject to §16(b). This was simply a failure of proof by Gentile. Judge Cote properly upheld Magistrate Judge Lehrburger's determination that the methodology employed by Gentile's experts to purportedly link the Post Discovery Records to trading in the Interactive Brokers account was unreliable and did not meet the admissibility requirements of FRE 702.

4. The awards of pre-judgment interest recommended by Magistrate Judge Lehrburger and the interest rate applied by Judge Cote in these cases following briefing by the parties are consistent with precedent and properly within the Court's sound discretion.

5. The Constitutional standing of an issuer of registered securities (or of any of its shareholders, upon satisfying the statutory demand and refusal requirement) to seek recovery of profits from proscribed insider short swing trading

21

under §16(b) has been decided adversely to Gentile's position by this Court on at least four occasions in recent years. Its challenge in this appeal is an intransigent refusal to accept this Court's teachings and is simply frivolous.

**<u>STANDARDS OF REVIEW</u>**

Judge Broderick's order granting summary judgment for the Plaintiffs, and denying Defendants' cross-motion for summary judgment, is reviewed *de novo*. *See Morales v. Quintel Ent., Inc.,* 249 F.3d 115, 121 (2d Cir. 2001): ("On appeal from a grant of summary judgment we review the record *de novo* to determine whether genuine issues of material fact exist requiring a trial. … The same standard applies where, as here, the parties filed cross-motions for summary judgment and the district court granted one motion, but denied the other") (internal citations omitted).

Magistrate Judge Lehrburger's evidentiary rulings—including the rejection of evidence in support of a damages theory contrary to the "law of the case," effectively a motion for reconsideration; and determination of the amount short swing trading profits subject to disgorgement—are all reviewed for abuse of discretion, and are upheld if within the range of reasonableness or absent "clear error." *See Palin v. N.Y. Times Co*., 113 F.4th 245, 269 (2d Cir. 2024); *Henry v. Oluwole*, 108 F.4th 45, 51 (2d Cir. 2024) ("We review the findings of a district court in connection with a damages award for clear error") (citing *Brown v. C. Volante Corp*., 194 F.3d 351, 356 (2d Cir. 1999))

22

The District Court's decision to award pre-judgment interest and the rate of pre-judgment interest applied are all reviewed for abuse of discretion. *See Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc*., 67 F.3d 1063, 1071-72 (2d Cir. 1995) ("The decision whether to grant prejudgment interest, and the rate used if such interest is granted, are matters confided to the district court's broad discretion"); *see also SEC. v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1476 (2d Cir. 1996) (upholding district court's award of prejudgment interest at the IRS underpayment rate instead of post-judgment interest T-bill rate advocated by the defendants).

The Court reviews the District Court's denial of Gentile's motion to vacate Judge Broderick's summary judgment order and dismiss these actions for lack of standing *de novo. See Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (facial challenge to standing is reviewed *de novo).*

## **ARGUMENT**

**POINT I.** **PROFITS RECOVERABLE IN THESE SUITS WERE CORRECTLY DETERMINED BY THE DISTRICT COURT**

### A. **"Pecuniary Interest" Was Addressed and Established on Summary Judgment**

In granting summary judgment for Plaintiffs (and denying Gentile's cross motion), Judge Broderick found that Plaintiffs demonstrated that Gentile had "beneficial ownership" over the shares traded in Mintbroker's Interactive Brokers omnibus account under both definitions applicable under §16(b):

23

First, for purposes of determining Defendants' status as 10% "beneficial owners" and §16(b) insiders, beneficial ownership is defined as "investment or voting control." Gentile does not dispute that he exercised control over and directed the trading in the Interactive Brokers account.

Second, for purposes of determining the Defendants' §16(b) liability, i.e., whether the Defendants were "beneficial owners" of shares purchases and sold while §16(b) insiders, "beneficial ownership" is defined as "pecuniary interest" or the opportunity to profit from trading in the shares. Judge Broderick also found that Gentile had the opportunity to profit and did profit from trading in the Interactive account. (R&R pp.35-36, SPA-77-78.)

This finding was not based on a conflation of the two definitions of "beneficial ownership," as Gentile asserts—but on Gentile's undisputed and unfettered authority over all shares and trading proceeds in the Interactive Brokers account (which was not segregated and did not differentiate between "proprietary" and "customer" shares or funds); and on evidence obtained from Interactive Brokers reflecting that actual cash profits realized in the Interactive account were disbursed in their entirety, and at Gentile's direction to a Mintbroker account that Gentile controlled. Gentile is wrong that the records submitted on summary judgment did not sufficiently demonstrate that Gentile reaped the difference between purchase and sale price, as Judge Broderick held. *See Picard Tr. for SIPA Liquidation of Bernard*

24

*L. Madoff Inv. Sec. LLC v. JABA Assocs. LP*, 49 F.4th 170, 185 (2d Cir. 2022) ("Defendants claim the undisputed facts show that the LLC never owned the JPMorgan accounts, but they have pointed to no material evidence of this. In contrast, the Trustee relies on substantial evidence that BLMIS owned these accounts.")

Gentile's "beneficial ownership" for purposes of determining his insider status, i.e., his dispositive authority over all of the shares held in the account, is established by his authority to sell all of the shares held in the Interactive account on the open market, which he did. Similarly, Gentile's "beneficial ownership" as defined by his "pecuniary interest" or "opportunity to profit" from all of the transactions effected in the Interactive account is established by his authority to take the proceeds of any sales and buy more shares of Plaintiffs' stocks, or other stocks, or simply to take the money and run.

Gentile asserts that this finding was improper because Plaintiffs' Rule 56.1 Statement asserted that Defendants had a "pecuniary interest" but did not citing to the record and was disputed in Defendants' statement. Defendants cite to ¶10, in which Plaintiffs stated that both Defendants had a "pecuniary interest" in the Interactive Brokers Trading Accounts and cited the definitional requirement of SEC Rule 16a-1. As Gentile notes, Defendants "disputed" this Paragraph as containing a legal conclusion.

But the immediately following ¶11 of Plaintiffs' R. 56.1 Statement describes and cites the evidentiary basis for Plaintiffs' assertion of pecuniary interest:

11. "Gentile, on behalf of MintBroker, had the authority to withdraw cash from the Trading Accounts in an amount equal to the "cash balance" of each Trading Account (including any proceeds from AWX [or GBR] trades), at any time. Upon closing all of MintBroker's Interactive accounts (including the Trading Accounts), at Interactive's insistence, in or around October 31, 2019, Gentile withdrew funds in an amount equal to the cash balance on all of MintBroker's Interactive accounts and the value of any marketable securities in the accounts, and transferred such funds to an account at Deltec Bank (a Bahamian bank) owned and controlled by Gentile." (Citing Ex. K, EX. L)

Notably, this Paragraph was _not disputed_ in Defendants' Response.

As Judge Cote's Opinion also aptly notes, Defendants did not dispute the assertion in Plaintiffs' R. 56.1 Statements that the Interactive accounts were "proprietary" accounts. (Opinion p.12, SPA-38). The basis for that assertion was the Stipulation entered into the parties for the purpose of submitting the case to Judge Broderick for a ruling on summary judgment.

Magistrate Judge Lehrburger's R&R, also referenced in Judge Cote's Opinion, reviews the history and purpose of that Stipulation as expressly intended to avoid any discussion or need for discovery of "client accounts," and the repeated statements and discovery responses provided by Gentile that the trading in the Interactive Brokers account did not include any trading for Mintbroker's customers.

More generally, the R&R explains in detail that there was no dispute prior to summary judgment as to whether shares were traded for clients. And *even*

26

*following the damages inquest*, the R&R notes that Gentile claimed that the "pecuniary interest" standard *might not even be relevant to this case*. (*See* R&R pp.5-6, SPA-48-49, noting that Gentile asserted in his Post-Hearing Brief that "It is unclear whether [SEC] Rule 16a-1(a)(2)'s reference to a 'pecuniary interest' *even applies*" (emphasis added)). Gentile's assertion that there was an active dispute about "pecuniary interest" that precluded summary judgment is another characteristic attempt to rewrite the record.

Judge Broderick correctly held that Gentile failed to create a genuine issue of material fact as to their pecuniary interest in the shares traded in the Interactive Brokers account. This was true on summary judgment, and it remained true even after Gentile was given the opportunity to present the evidence he claims to have only uncovered after summary judgment. To this day, Gentile has never introduced evidence of any kind evidencing the transfer of any shares or cash trading proceeds held or realized in Mintbroker's Interactive Brokers account to, or their withdrawal by, any supposed third-party customers or clients of Mintbroker.

In any event, as further discussed below, the entire premise of Gentile's damages theory, which is that he does not have a "pecuniary interest" in shares that were purchased by Gentile in the Interactive Brokers account as a response to an order "initiated" by a customer, is contrary to the law of the case decided by Judge Broderick, which correctly held that there was no material dispute as to Gentile's

27

full control over all shares and cash in the Interactive Brokers account, and correctly rejected any defense based on the Defendants' motivation in trading the stocks.

And Judge Broderick also rejected the notion that there cannot be more than one beneficial owner of the same stock. As stated in the Summary Judgment Order at p.23 (SPA-23):

> "For example, the regulation specified that an investor will be deemed the beneficial owner of the shares if they have the right to acquire them within 60 days. In other words, in such a situation, these shares will have at least two 'beneficial owners:' the current owner, and the person who have the right to acquire them within 60 days."

Even if Mintbroker's customers may have had a pecuniary interest in shares created by their dealings with Mintbroker, Gentile and Mintbroker *also* had a pecuniary interest in shares that Gentile had the opportunity to sell on the open market and cash out of Mintbroker's Interactive account.

Finally, even after being given the opportunity to present their allegedly newly revealed evidence, the reliability and probative value of that evidence was reasonably assessed by Magistrate Judge Lehrburger in his sound exercise of discretion and should not be disturbed by this Court.

**B. Damages Were Properly Determined at the Inquest**

    **1. The Inquest Was Ordered to Calculate the Amount of §16(b) Profits Realized by Defendants From Trading in the Interactive Brokers Account—Not to Relitigate Defendants' §16(b) Liability or Pecuniary Interest in the Account**

Gentile asserts that the purpose of the inquest ordered by Judge Broderick was to determine "pecuniary interest" and that he was then unfairly precluded by Magistrate Judge Lehrburger from offering his evidence on pecuniary interest at the inquest.

None of that is true. It is undisputed that Gentile accumulated and held more than 10% of the Plaintiffs' stocks in the Interactive account for a period of several days, during which time he executed thousands of trades in each stock in that account.

The damages inquest was not ordered to determine whether Gentile had a "pecuniary interest" in the Interactive Brokers account, which was established by Plaintiffs and not materially disputed when the case was submitted on summary judgment. The purpose of the inquest ordered by Judge Broderick, as Judge Cote and Magistrate Judge Lehrburger both explained, was to identify the exact period when the account held more than 10% of the Plaintiffs' stocks and the transactions executed during those periods that resulted in the realization of short swing profits in the account.

29

In view of Judge Broderick's finding of liability on summary judgment, Plaintiffs' burden at the inquest was to make a prima *facie case* for the amount of disgorgement, which they did based on the same Interactive Brokers records that formed the basis for Judge Broderick's summary judgment determination.

As discussed in the Opinion, Gentile's response was to seek to introduce records of thousands of more trades and expert evidence purporting to establish that these Post-Discovery Records demonstrated that most of the trading in the Interactive account represented "customer" trading. Although this was not the purpose of the inquest ordered on summary judgment, as Gentile had never previously asserted and had expressly disclaimed that any of the trading involved "customer" trading, this became the focus of the inquest as Gentile was permitted to re-open discovery for months to present this new theory to the District Court over the course of the two-day hearing.

Magistrate Judge Lehrburger likewise devoted the bulk of the R&R to examining the records and expert testimony that Gentile submitted in support of his damages theory. The evidence Gentile claims supports his Gentile's damages theory was evaluated and rejected as contrary to the law of the case decided by Judge Broderick in his Opinion & Order on summary judgment, which correctly applied both applicable definitions of "beneficial ownership;" and as failing to meet the

30

reliability standards of F.R.E. 702. These evidentiary determinations were within the District Court's sound discretion.

### 2. Plaintiffs Established a *Prima Facie* Case for Disgorgement of Short Swing Profits Based on Trading in the Interactive Brokers Account

As Judge Lehrburger found:

> "Plaintiffs have proved *their prima facie* case of short-swing profits in the amount of $6,235,908 for Avalon and $6,102,002 for New Concept. Those calculations are based on the Interactive Trading Records and Mintbroker's corresponding Schedule 13-D filings and a detailed analysis of the dates and times when Defendants crossed the 10% beneficial ownership threshold, matching of the relevant trades, and application of the requisite lowest-in-highest-out methodology."
> (R&R p.56, SPA-98.)

Judge Cote properly reviewed Magistrate Judge Lehrburger's determination that Plaintiffs correctly calculated damages for "clear error," and adopted the damages awards recommended. (Opinion p.15, SA-) (noting that Magistrate Judge's evidentiary findings are reviewed for "clear error" and not *de novo*). This Court applies the same standard of review to Magistrate Judge Lehrburger's evidentiary determinations and should uphold the Judgments in the amounts awarded.

31

### 3. Gentile Did Not Demonstrate That Any Shares or Profits Were Traded or Realized in the Interactive Account for the Benefit of Third-Party Customers of Mintbroker, and Excluded From Their Pecuniary Interest

#### a. Gentile's Damages Theory Was Rightly Rejected as Incompatible With the Law of the Case and With Governing Law

As discussed above, Judge Broderick considered both pecuniary interest and investment control and found that both were established by the evidence. That evidence included a stipulation by the Defendants that all trading in the Interactive account was proprietary trading that did not include any client trading. Defendants' assertion that the customer records were unavailable at the time is simply false. As Judge Cote held, Plaintiffs and the Court were entitled to rely on those representations and the evidence elicited in discovery and put before the District Court by both parties in connection with their cross-motions for summary judgment.

Judge Cote and Magistrate Judge Lehrburger correctly concluded that Gentile's proposed finding that he was never a statutory "insider" of Avalon and that only a fraction of the New Concept shares should count towards his "beneficial ownership," were directly and inexcusably in conflict with Judge Broderick's determination of §16(b) liability on summary judgment.

As Magistrate Judge Lehrburger also noted, the damages theory espoused by Gentile's experts—that trades executed in the Interactive account should be excluded from his pecuniary interest if identified (unreliably) as

32

"initiated" by a customer order, thus "owed" by Mintbroker to a client—is contrary to Judge Broderick's correct rejection of any consideration of Gentile's motivation for executing the trades as irrelevant to §16(b) liability; and of Defendants' suggestion that shares cannot have more than one "beneficial owner" under both applicable definitions.

Thus, as Magistrate Judge Lehrburger further explained, there is no basis under the rules for "netting" out transactions between Mintbroker and a customer, which were not executed on the market, from the shares held in Mintbroker's Interactive omnibus account in the manner proposed by Gentile's experts, and no basis in law or in fact for their ascribing a "negative" beneficial ownership to Gentile, supposedly reflecting a "short" position, at times when he held (significantly) more than 10% of the Plaintiffs' outstanding stocks. (*See* R&R p.54, SPA-96)

### b. The Expert Reports and Testimony Were Also Properly Excluded as Unreliable

Although Magistrate Judge Lehrburger found that the evidence presented at the inquest was not "newly discovered" and that the analysis espoused by his experts was contrary to the law of the case, Magistrate Judge Lehrburger did not fail to consider the Post Discovery Records or the testimony and reports of his experts. Magistrate Judge Lehrburger _denied_ Plaintiffs' motion *in limine* to exclude the Post Discovery Records and expert testimony as a discovery sanction (but

33

recommended an award of attorneys' fees, which was adopted by Judge Cote though later waived by Plaintiffs in the interest of expediency).

Indeed, the focus of the two-day inquest was to evaluate the Post Discovery Records and expert testimony. Magistrate Judge Lehrburger's R&R found that it did not establish that any trades included in Plaintiffs' calculations should be excluded from Gentile's beneficial ownership—whether defined as "investment control," for purposes of determining his 10% "beneficial ownership" and insider status; or as "pecuniary interest" for purposes of the matching analysis performed by Plaintiffs.

Magistrate Judge Lehrburger correctly found, and Judge Cote properly adopted the recommendation that the methodology employed by Gentile's experts for identifying customer trading was unreliable and inadmissible: (Opinion p. 14)

> "One expert testified that he got 'comfortable' that certain accounts in the Interactive records were in fact customer accounts 'based on having looked at some unspecified number of unspecified account numbers in a 'master file' that Defendants did not produce and for which the expert did not make any record. This does not reflect 'reliable principles and methods' or 'sufficient facts or data' as required by F.R.E. 702. Nothing in "either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). The second expert 'made no effort to verify or test the accuracy, completeness, or validity of' the Post-Discovery Records and thus his testimony is not based on sufficient facts or data."

As the R&R notes, Gentile's experts did not even review the Interactive Brokers records on which liability was based. They also did not review a single

34

Mintbroker customer account statement to verify whether any so-called customer trades were in fact "routed to Interactive," as Gentile contends, or whether any of the shares held in the Interactive account were credited to or reflected in customer accounts following a trade recorded in Mintbroker's system.

The "methodology" that Gentile insists should have been accepted—i.e., his random sampling of accounts designated as "client accounts" to see if they had a client owner with a name other than Gentile or Mintbroker—was correctly rejected by Magistrate Judge Lehrburger for the many reasons outlined in the R&R, as Judge Cote agreed. (Opinion p.14, SPA-116.)

## POINT II. <u>THE PRE-JUDGMENT INTEREST AWARDS WERE PROPER</u>

This Court has stated that "pre-judgment is generally awarded as part of §16(b) recoveries," *Morales v. Freund*, 163 F.3d 763, 687 (2d Cir. 1999), consistent with the principle that prejudgment interest may be awarded "in response to considerations of fairness and denied when its exaction would be inequitable." *Blau v. Lehman*, 368 U.S. 403, 414 (1962).

The decision to award pre-judgment interest and the rate of interest applied are both left to the discretion of the District Court. That discretion was not abused and should not be disturbed by the Court.

The determination that an award of pre-judgment interest was warranted and equitable is supported by Magistrate Judge Lehrburger's extensive

35

history of the tactics employed by the Defendants to delay this litigation since these cases were initiated. Gentile's realization of millions of dollars of short swing trading profits was the result of a manipulative pump and dump scheme, which wreaked havoc in the markets for Plaintiffs' stocks. Due to Defendants' further dilatory and willful conduct throughout discovery and continuing through the inquest and on this appeal, Defendants have had the benefit of their illegal short swing profits for over 7 years. Post-judgment interest is not even accounted for in the Final Judgments and continues to accrue.

The rate of interest and compounding rate applied by Judge Cote is consistent with the rate of interest applied by district courts in §16(b) cases, even absent the egregious conduct that is well documented in these cases. *See Roth v. Jennings*, No. 03-CV-7760-DAB, 2009 WL 1440670 (S.D.N.Y. May 21, 2009). As in *Jennings*, the federal underpayment rate chosen by the District Court in this case is the prejudgment interest rate applied to enforcement actions brought by the SEC, which serves a similar purpose to prejudgment interest awards under §16(b), i.e., to compensate the judgment creditor for deprivation of the funds since the claim matured; and to deprive the judgment debtor of the unjust enrichment afforded by his holding of wrongfully converted funds during that time. This is consistent with the purpose of §16(b) as creating a constructive trust for the benefit of issuers consisting of any profits wrongfully realized from statutory insiders who engage in

36

short swing trading, *see generally Donoghue v. Bulldog Investors GP,* 696 F.3d 170 (2d Cir. 2012).

This Court has also suggested that compounding is usually appropriate in awarding prejudgment interest and that failure to compound might even constitute an abuse of discretion. *Cf. Saulpaugh v. Monroe Cty. Hosp*., 4 F.3d 134, 145 (2d Cir. 1993) (finding the district court's failure to consider applying a compound rate of pre-judgment interest constituted an abuse of discretion).

In any event, the decision to award prejudgment interest and the rate applied, including the decision to compound interest and the frequency of compounding, are all left to the discretion of the District Court, which was soundly exercised in this case after briefing on the issue submitted by the parties. The prejudgment interest awards are not abuses of discretion and should be upheld.

## POINT III. PLAINTIFFS HAVE CONSTITUTIONAL STANDING

Whether an issuer of securities or, under appropriate circumstances, the holder of any security of the issuer, has standing under Art. III of the U.S. Constitution to bring suit to recover so-called "short swing profits" was decided unequivocally by this Court in *Donoghue v. Bulldog,* 696 F.3d at 173: "This Court has categorically held that 'short-swing trading in an issuer's stock by a 10% beneficial owner in violation of §16(b) causes injury to the issuer sufficient for

constitutional standing.'" *See also Microbot Med., Inc. v. Mona*, 24-cv-559, 2025 WL 262590, at *1 (2d Cir. Jan. 22, 2025).

In *TranUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021), the Supreme Court held that the "concrete injury" sufficient to confer Art. III standing must be a "physical, monetary, or cognizable intangible harm traditionally recognized as providing a basis for a lawsuit in American courts." The question of whether *TransUnion* abrogated *Donoghue* has now been raised twice before this Court. This case raises the same question a third time.

In the first instance, *Packer v. Raging Capital Mgmt.*, LLC, 105 F.4th 46, 51 (2d Cir. 2024) the Court held that *Donoghue* remains good law, reaffirming its holding the "the concrete injury that confers standing [on plaintiffs' §16(b) claims is] the "breach by a statutory insider of a fiduciary duty owed to the issuer not to engage in and profit from any short-swing trading of its stock." *Id.* at 55 (quoting *Donoghue*, 696 F.3d at 180).

In the second instance, *Microbot*, decided only last month, the Court held that it was "bound by our well-reasoned precedents in *Packer* and *Donoghue* and affirm the district court's denial of Mona's motion to dismiss for lack of Article III standing." *Microbot*, 2025 WL 262590, at *1. The Court should, once again, reach the same conclusion for the same reasons.

38

## **CONCLUSION**

Gentile's brazen flight and his liquidation and removal of his domestic assets from the reach of U.S. courts to avoid enforcement of the substantial Judgments entered against him provide compelling reason for the Court to apply the Fugitive Disentitlement Doctrine and dismiss these appeals without further consideration.

Should this Court proceed to consider the merits of the appeals, the Judgments should be affirmed. These appeals are best understood as a continuation of the dilatory tactics that have been a hallmark of Gentile's conduct in throughout the pendency of these cases, as summarized in the Opinion and even more thoroughly reviewed in the R&R.

The appeals should be dismissed and/or denied.

Dated:    Southampton, NY
          February 24, 2025

                    Respectfully submitted,

                    */s/ David Lopez*
                    David Lopez
                    Miriam Tauber
                    *Attorneys For Plaintiffs/Appellees*

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that the foregoing Brief contains a total of 9,008 words and is formatted in Times New Roman 14 pt. font using Microsoft Word.


*/s/ Miriam Tauber*

_____

Miriam Tauber, *Attorney for Plaintiff/Appellee*